# FRENCH *v.* HALCOMB.

---

INTERFERENCE; ORIGINALITY; BURDEN OF PROOF; UNCORROBORATED EVI-
DENCE OF INVENTOR.

1. An applicant in interference, who files his application after the granting of the patent, has the burden of proving his prior right beyond a reasonable doubt; and this burden is not discharged by merely raising a doubt as to which party had the first conception of the invention.

2. The practically uncorroborated evidence of the inventor himself cannot be accepted on an interference proceeding as proof of conception. (Following *Winslow* v. *Austin,* 14 App. D. C. 141; *Garrels* v. *Freeman,* 21 App. D. C. 212.)

3. A memorandum in a notebook produced by an applicant in an inter-
ference proceeding, and alleged to prove prior conception, is insufficient
for that purpose where it appears that the entry was seen by no one,
and there is no corroborative evidence on the point except a statement
by a witness that he saw the applicant produce such a book.

No. 296. Patent Appeals. Submitted November 15, 1905. Decided De-
cember 5, 1905.

HEARING on an appeal from a decision of the Commissioner
of Patents in an interference proceeding.          *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. Marshall A. Christy* and *Mr. George H. Christy* for the
appellant.

*Mr. Alfred Wilkinson* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the
Court:

This is an interference proceeding involving the invention of
high-grade steel as described in the following three counts of the
issue of interference:

"1. A high-grade steel containing less than 1.20 per cent of
carbon, and from 6 per cent to 15 per cent of molybdenum.

"2. A high-grade steel containing less than 1.20 per cent of
carbon, from 6 per cent to 15 per cent of molybdenum, and
from 2.50 per cent to 6 per cent of chromium.

"3. A high-grade steel containing less than 1.20 per cent of
carbon, from 6 per cent to 15 per cent of molybdenum, from
2.50 per cent to 6 per cent of chromium, and less than 2 per
cent of silicon."

The junior party, Edmund L. French, filed his application
May 6, 1903. His preliminary statement alleges conception
about December 31, 1899, disclosure on the same date, and
reduction to practice on or about April 24, 1902.

Halcomb's claim is founded on a patent issued March 10,

1903, upon an application filed January 21, 1903. No preliminary statement by him is found in the record, and he has taken no testimony. His date of conception and constructive reduction to practice are fixed by his application.

Upon the evidence taken by French in support of his claim, the Examiner of Interferences awarded priority to Halcomb. This decision was reversed by the Examiners-in-Chief. They, in turn, were reversed by the Commissioner, who decided in favor of Halcomb.

Having filed his application after the patent had been issued to Halcomb, French is charged with the burden of establishing his prior right beyond a reasonable doubt.

The several decisions of the Patent Office tribunals show that the points at issue have received very careful consideration, and those of the Examiner of Interferences and the Commissioner review the testimony at length.

Both parties are deeply skilled in the art of manufacturing high-grade steel particularly adapted for making tools used in working steel, and capable of operation at high speed. Halcomb was formerly the president of the Sanderson works at Syracuse, New York. In July, 1900, that plant was taken over with many others by a new organization called the Crucible Steel Company of America, of which Halcomb then became president, holding the office until June, 1902. Before this date, the invention of the issue was reduced to practice at the Sanderson works.

In 1897, French, who was then twenty-seven years of age, was employed as a chemist by the Sanderson company. Subsequently, as stated by him, he had "charge of the formulæ for making steel, and general charge of the metallurgical end of the business there."

While Halcomb was president of the Sanderson company he had constant direction and supervision of all the analyses made and experiments tried. After removal to Pittsburg as president of the general owning corporation, he frequently visited the Sanderson works, and through reports and letters from French was advised of all that took place there until the relinquish-

ment of his last position in June, 1902. During the whole period there was constant competition with high-speed tool steels of foreign manufacture. It appears from the testimony of French, that, before 1898, or 1899, molybdenum had not been used to any extent as an ingredient of tool steel, and that, after experiments therewith at the Sanderson works, it was decided in November, 1900, to substitute it for the tungsten grade, then in general use. In the meantime, or shortly after, the Crucible Steel Company acquired a practical monopoly of molybdenum in the United States.

The record sets forth lengthy correspondence between French and Halcomb, relating to many analyses of steel, the product of different manufacturers, specimens of which were generally sent by Halcomb for the purpose, and to experiments carried on by French chiefly, at least, under Halcomb's instructions. This began September 24, 1901, and ended May 3, 1902. In this first letter from Halcomb to French, dated September 24, 1901, he said: "I don't want any experimental steels to be made at Syracuse or elsewhere without my previous knowledge and sanction, nor must any change be made, either, in the mixtures."

The testimony in general shows not only that the advantages of the use of molybdenum instead of tungsten were recognized fully, but that low-carbon mixtures were already in general use. It seems, also, that the suggestion of a combination of very low carbon with molybdenum came from one B. V. Maxwell, also an expert employee of the Crucible company. Writing to Halcomb, under date of January 12, 1902, he refers to a new steel, which he says is a "wonder," of the following composition: $11\frac{1}{2}$ per cent tungsten, $2\frac{1}{2}$ per cent chromium, and 8-10 of 1 per cent carbon. He then suggests that the Sanderson works "get out, for experiment, a few pieces for test, of the very low-carbon, molybdenum, self-hardening steel." Prior to that, as shown by French's letter of December 6, 1901, he had made an analysis of a sample of Capital steel, manufactured by others, which had been sent by Maxwell. This shows a composition of tungsten, chromium, silicon, and .41 of carbon. In concluding this letter to Halcomb he says: "There is not a steel in existence that can

stand long against our Mo. steel treated, and, as long as we can keep a fair control over the molybdenum market, we can laugh at competition in the steel hardening line."

It would protract this opinion to an unusual length to undertake to review all of this correspondence, nor is it important to do so.

Counsel for French refer especially to his letter to Halcomb of March 14, 1902, as first disclosing this invention among the experimental analyses therein given. The Commissioner expressed the opinion in his decision that French's suggested composition was nothing more than the report of the result of Halcomb's directions in his letter of January 14, and March 1, 1902. The first of these directs a sample made according to the analysis of the "Capital" steel, hereinabove mentioned, for test by Maxwell. Attention is also called to what Maxwell had said about the composition of another steel,—the "wonder," described in Maxwell's letter of January 12,—and concludes: "This latter we could easily duplicate; but I also think that molybdenum can be substituted for tungsten to advantage."

In this letter he refers to samples of steels sent to French, and gives analyses that had been made at other works belonging to the Crucible company. Two of these showed tungsten, by substituting molybdenum for which, according to the well-known proportion of about one for two, as indicated in former letters to French, the composition of the issue was substantially disclosed. Moreover, he adds: "I would like you to get more information for me on those steels. Make some tests with them and see how you think they are as compared with our S. H. Mo. specially treated, and whether you think there is anything in having the carbon lower."

It is not necessary for the purposes of this case to consider whether Maxwell may not have contributed the idea which led directly to the specific composition that has been declared patentable, or whether Halcomb had a substantial conception of the same when he gave his directions to French to make experiments upon that line. Nor need we determine that what French may have come upon in carrying out the directions of Halcomb

accrued to the latter as his employer for that purpose. It is sufficient only to say that all of the testimony, taken together, has no greater effect than to raise a doubt merely as to whether French or Halcomb had the first conception of the invention. The raising of such a doubt, however, does not meet the requirement of the burden imposed by the established rule upon one who seeks to overcome a regularly issued patent.

A part of the testimony considered in reaching the foregoing conclusion consists of a long memorandum in a notebook produced by French. This memorandum, bearing date September 14, 1900, is too lengthy to be recited. Assuming that it discloses the "low-carbon idea" completely, the proof of it is insufficient. French kept this book to himself. No one read the entry. One witness testifies that French produced a book like this in May, 1902. He gives no precise date, but any time in May was more than a month after the letters passed between French and Halcomb, that have been particularly referred to above. Moreover, the witness's recollection of what he heard is rather indefinite. The practically uncorroborated evidence of the inventor himself cannot be accepted as proof of conception. *Winslow* v. *Austin,* 14 App. D. C. 141; *Garrels* v. *Freeman,* 21 App. D. C. 207, 212.

Again, there are certain circumstances tending to cast doubt upon the actual date of this memorandum. Throughout French's entire correspondence with Halcomb, there is no reference to it. In a letter written December 16, 1902, to Halcomb's successor as president of the Crucible company, he refers to an idea he had had for securing patents for the company's benefit upon all mixtures then in use. The particular composition is not mentioned, save as it may be included in all the mixtures of molybdenum, and he goes on to say: "I believe we should take out patents covering the use of molybdenum alone for high-speed steels, and for all high percentages of molybdenum and chromium, also patents for low percentages of the same, such as might be used in magnet and other special steels."

No applications seem to have been prepared, certainly none were filed, until after Halcomb's patent had been brought to his

attention. He refers to this in a letter to Smith of March 31, 1903. Making no statement of his own invention, he says: "I regret that my delay in giving you the specifications as required by our patents attorneys has perhaps allowed Mr. Halcomb to step in first and secure rights, and am sorry now I took so much pains to have the claims broad. The patent I had in mind would have covered a wider field than Halcomb's in case the magnet steels had proven a success."

After some further correspondence between the same parties, relating to patent applications, French wrote, on April 28, 1903, for his letters to Halcomb of March 28, 29, April 5 and 6, 1902, saying: "These letters should show whether Mr. Halcomb instructed me, as his own idea, to duplicate the various high-speed steels of which I sent him an analysis, or whether I made the suggestion that it be done and get his approval." This is followed by those analyses, seven in number, that were given in the correspondence with Halcomb. The letter then proceeds as follows: "These were duplicated here by making molybdenum steels with one half the percentage they contained in tungsten, approximately, and were given the numbers at the left of the table above, which you will find to correspond with the table of experimental steels already in your hands. I think the letters I have mentioned above as missing will supply the information we want as to the originality of the idea, if there was any. It seems to me that it will be best to work on the fact that what was done by the Sanderson Brothers Steel Company while Mr. Halcomb was here, and afterwards while he was president of the Crucible Steel Company, was not original with him or with me, but was merely imitation of what had already been accomplished with molybdenum by others. I find that we made an analysis of Crescent Mo. self-hardening here before we ever made it ourselves. A sample of Crescent Mo. steel analyzed April 1, 1899, showed C. 1.65, Mo. 3.98, Cr. 4.22, and it is probable that the ingot made at the Sanderson works April 18, 1899, was a copy of this, the analysis being so similar, namely, C. 1.60, Mo. 4.08, Cr. 4.02. Mr. Halcomb added .64 silicon to this analysis on general

principles, it being our practice at that time to use about that amount of silicon in our tungsten self-hardening steel.

"In the same way that we copied the Crescent steel for high-carbon self-hardening, we imitated the various makes of foreign low-carbon steel; and Mr. Halcomb says to me in a letter dated March 31, 1902: 'It is quite evident now that everyone is working on low carbons, and that is what we have got to do.'" This was written on receipt of the list of analyses quoted in the first part of this letter. Mr. Halcomb says further in his letter of the 31st March: "I think that Krupp's would be a very good steel to duplicate, with, say, .75 carbon, 9.75 tungsten, or half that quantity Mo., 3.00 chromium, .25 to .35 silicon. There is not a great deal of difference, I should think, between that and Vickers-Maxim, though for the latter add a little more chromium and use a little less tungsten. Suppose you make an ingot of each, one being of the analysis I have just given you and the other like Vickers-Maxim, .75 carbon, 7.55 tungsten, or one half the amount of Mo., and 3.75 chromium. Then we will find out which is the better of the two. The Styrian steel must be a great deal more expensive than either of the others. Still it would be interesting to know what results could be obtained with about .60 carbon, 10.00 Mo. and 6.50 Cr.

"I believe you will find that in my letter of March 28 to Mr. Halcomb, or that of March 29, I suggested to him that we duplicate all the foreign steels, analysis of which I gave him and contained in the table on the first page of this letter.

"I am certain that he never gave me any suggestions or instructions as to the analysis of steel No. 5 or No. 9, both of which proved superior to any of the others, and both of which have been used as our regular steels.

"I send inclosed a copy of matter in my notebook under date of September 14, 1900, which will show that I had the low-carbon idea long before it was used in this country or abroad, and that I told Mr. Halcomb about it. I never made the experiments spoken of in my notes, being discouraged from trying them at that time by Mr. Halcomb's opposition, he having no faith in what I proposed."

It is singular, to say the least, that one now claiming the invention, and with his notebook and the correspondence before him, should have suggested a doubt whether it was original with him or Halcomb either, and also whether it was an invention at all because an imitation of what had already been accomplished by others. Although he sent the memorandum of the notebook for the consideration of the patent experts of his company, it seems that the only thing he then claimed as original was the "low-carbon idea."

It does not appear when the low-carbon steels of foreign manufacture, which French analyzed in 1901 and 1902, were first made, but the "low-carbon idea" was certainly not a new one in 1900, because French's witness, Gardner, who was manager of the Sanderson works, said that low-carbon self-hardening steels had been made years ago by two different English manufacturers, and that he had formerly been in the service of one of them as assistant manager of the rolling mills.

We are far from being convinced that French was the first to conceive the specific invention of the issue, and must, therefore, affirm the decision of the Commissioner. It is so ordered, and that this decision be certified to the Commissioner of Patents as the law requires.                              *Affirmed.*